UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE CREAL, KASANDRA MURPHY, and FELICIA WRIGHT, on behalf of themselves and all other similarly situated persons, known and unknown, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 13 C 4275 |
| GROUP O, INC., | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

Plaintiffs Michelle Creal, Kasandra Murphy, and Felicia Wright (collectively, "Plaintiffs") filed this three-count action in June 2013 against Defendant Group O, Inc. ("Group O") seeking overtime wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* (Count I) and Illinois wage laws (Counts II and III). Plaintiffs allege that "Group O has an unlawful policy or practice of rounding employees' swipe-in and swipe out times in a manner that almost always benefits Group O," and that Plaintiffs worked before and after their shifts, and during unpaid meal periods, without overtime pay. Compl., Dkt. 1, ¶ 7. The Court conditionally certified Plaintiffs' FLSA claim in May 2014 (Dkt. 48), after which 91 additional plaintiffs opted in. Pltf. Opp., Dkt. 123, at 1. Now before the Court is Group O's Motion to Decertify (Dkt. 108). For the following reasons, that motion is granted.

## BACKGROUND

Between 2010 and 2013, Group O was a provider of logistics, manpower, and staffing services to Caterpillar, Inc. ("CAT") at its plant in Joliet, Illinois. Pltf. Opp., Dkt. 123, at 3; Def. Mem., Dkt. 109, at 5. Plaintiffs and opt-in plaintiffs worked as non-exempt hourly employees of Group O at CAT's Joliet plant during this time. Pltf. Opp., Dkt. 123, at 3. According to Group O, from June 2010 through 2013, 652 Group O employees and 29 supervisors worked at the CAT Joliet plant, with up to 223 employees working at any one time in up to 27 different positions. Def. Mem., Dkt. 109, at 6. Such employees provided staffing and manpower services to CAT on a 24-hour basis over three eight-hour shifts, and CAT paid Group O for work performed by Group O's employees. Pltf. Opp., Dkt. 123, at 4. According to Plaintiffs, "the amount of such compensation was calculated by Defendant's Kronos system based on the number of hours worked by Defendants' employees." *Id*. at 4. "Kronos" is an "electronic timekeeping and payroll system" used by Group O that "records and stores employees' punch-in times and punch-out times when employees swipe in or out of the workplace using their timecards." *Id*.

Plaintiffs acknowledge that Group O's policies "stated that employees of Defendant were prohibited from working before or after their scheduled shifts unless they received approval to work overtime." *Id*. at 5-6. Plaintiffs also acknowledge that employees "were required to be present at their work stations at the beginning of their shifts." *Id.* at 5. Plaintiffs complain, however, that "as a result of Group O's policies

as applied in the workplace, employees frequently began the undertaking of their assigned job duties prior to their scheduled start time, and continued working after their scheduled end time." *Id*. at 6.  Specifically, Plaintiffs contend that Group O "instructed its employees to punch-in as much as fourteen minutes prior to the scheduled start of their shift," that employees "were expected to be working . . . once in the CAT facility," and that they "were also directed to complete their assignments before punching-out for the day and as such, would often have to continue working after their scheduled shift-end time." *Id*. at 5-6.  According to Plaintiffs, they were not compensated for this pre- and post-shift work, because Group O "programmed its Kronos system to automatically round an employee's clock-in times to the employee's scheduled start time when the employee punched in less than fifteen (15) minutes prior to his or her scheduled start time," and "to automatically round an employee's clock-out times to the employees scheduled shift end time when the employee punched out less than fifteen (15) [minutes] after his or her scheduled end time." *Id*. at 6-7.  Finally, Plaintiffs further contend that they "were also frequently required to work through unpaid meal periods, in order to keep up with a varied, unpredictable, and generally heavy workload." *Id.* at 9.

Group O disputes any such "early-in policy," and asserts that its employees were instead "instructed to punch in <u>no earlier</u> than fourteen minutes prior to their shift in order to start work at their shift start." Def. Reply, Dkt. 126, at 4.  As Plaintiffs' brief acknowledges, the testimony of Group O's Operations Manager,

David Fillmore, bears this out: "they were instructed to punch in no earlier than 14 minutes before the shift started because the Kronos system rounds to the hour." Pltf. Opp., Dkt. 123, at 5, n.2 (quoting Fillmore Dep., Dkt. 123-1, at 91). The testimony of various named and opt-in Plaintiffs similarly confirms that employees could punch in "up until" their shift start-time.[1] Indeed, two opt-in plaintiffs (Hall and Hernandez Patrick) each testified that they were told *not* to punch in more than 8 or 10 minutes before their shift, and were reminded *not* to do so on those occasions that they punched in earlier. Hall Dep., Dkt. 110-2, at 104-08 (confirming "If you punched in more than eight minutes before your scheduled shift, you'd get a warning from Group O"); Hernandez Patrick, Dkt. 110-2, at 45-46 ("the two incidents that I did clock in early, they did come and made me aware of that"). Thus, Group O argues "that Group O did not have an 'early-in' policy but had just the opposite 'no early-in' policy." Def. Mem., Dkt. 109, at 16 (citing West Dep., Dkt. 110-2, at 48; Hall Dep., Dkt. 110-2, at 104-08; Holmes Dep., Dkt. 110-2, at 47-49).

Group O similarly contends that "Plaintiffs were unable to identify any common policy or command that they work unpaid overtime" after their shifts. Def.

---

[1] *See, e.g.*, Merkson Dep., Dkt. 126-2, at 47; *see also* Holmes Dep., Dkt. 110-2, at 47-49 (confirming he could punch in "up to" 11:00 for an 11:00 shift); Creal Dep., Dkt. 110-1, at 80-82 (confirming she could punch in up until 7:00 for a 7:00 shift: "They didn't say what time" to punch in); West Dep., Dkt. 110-2, at 48 (confirming "you could not punch in more than 10 minutes before your scheduled time"); Hall Dep., Dkt. 110-2, at 104-08 (confirming "You were not allowed to punch in more than eight minutes before your scheduled start of your shift"); Hernandez Patrick, Dkt. 110-2, at 45-46 ("they never told me, Well, you've got to clock in 10 minutes to, you know, before you start your shift. When we had the orientation, they just said we had to be in our work area by 7:00").

Mem., Dkt. 109, at 18.  According to Group O, the evidence "shows that if Plaintiffs needed to work past their shift, in accordance with Group O policy they would ask for and get approved overtime for which they were paid.  *Id*.  For instance, several Plaintiffs and opt-in plaintiffs (including those cited by Plaintiffs to support their post-shift work claim – Creal and Crisler, *see* Pltf. Opp., Dkt. 123, at 18) admitted to being paid for post-shift work,[2] with Ms. Creal apparently paid over a thousand hours of overtime in her two-year tenure.  *See* Def. Mem., Dkt. 109, at 11 (citing Dkt. 110-1, at GO-INC 13968-14008).  Group O also notes that Plaintiffs and opt-in plaintiffs who complained of unpaid post-shift work often had no knowledge of when or how often they performed the work.  *Id*. at 18.[3]  Thus, Group O argues, there is "little evidence about actual post-shift work and when there is, the nature of and reasons for such post-shift work are highly individualized."  *Id*. at 27; *see also infra* Part I.

---

[2] *See*, *e.g.*, Creal Dep., Dkt. 110-1, at 97-98 (acknowledging payment for overtime "quite often"); Crisler Dep., Dkt. 110-2 at 45 ("when you were asked to do something more, you performed that, and to your knowledge you were paid for that time?  A.  Generally, yes, yes, yes."); Murphy Dep., Dkt. 110-1, at 139-41 ("Q.  There is a whole bunch of times here where you were getting paid for working late, is that correct. . . . A.  I see that."); Gabriel Dep., Dkt. 110-2, at 38, 49-50 (when he worked overtime, he would "contact someone" in Group O "for permission" and was "compensated for that time"); Hall Dep., Dkt. 110-2, at 180-81 ("You worked and you believe you were compensated for that time?  A.  Yes."); Holmes Dep., Dkt. 110-2, at 50-52 ("if you were working the third shift and you were required to stay past 7:00 a.m., that would have been approved overtime you were compensated for; is that correct?  A.  Yes.").

[3] *See*, *e.g.*, Creal Dep., Dkt. 110-1, at 97-98 ("I guess.  I don't know. . . . I don't remember none of this."); Jones Dep., Dkt. 110-2, at 138-40 ("I have no documentation. . . .  I can't remember."); West Dep., Dkt. 110-2, at 60-61, 86 ("I don't know. . . . I don't have anything."); Lujan Dep., Dkt. 110-2, at 73-74 ("you don't have any evidence to support that you have any damages, true? . . . True.").

Lastly, Group O further disputes that Plaintiffs were "required to work during their lunch breaks as a policy or practice of Group O," and asserts that "any missed or interrupted lunches were unrelated occurrences." Def. Mem., Dkt. 109, at 16. For support, Group O points to its Employee Handbook instructing employees to take their "full-allotted time for your meal period" and "not perform any work during your meal period,"[4] along with testimony from various Plaintiffs admitting that they knew of this policy,[5] and that no one at Group O told them to work through their meal break; rather it was their own decision to do so.[6] And again, Group O contends that "Plaintiffs make no allegations of any similar reasons for not taking a full meal period," and that "Plaintiffs' work experiences are too varied for the court to collectively evaluate their meal claims." Def. Mem., Dkt. 109, at 17, 30; *see also infra* Part II.

---

[4] *Id.* (citing Ex. 8, Dkt. 110-1, at 14: "You are expected to take your full-allotted time for your meal period. Do not perform any work during your meal period.").

[5] *See*, *e.g.*, Lujan Dep., Dkt. 110-2, at 40-44 (knew from reading employee manual that "you had a lunch period and you were expected to take your half hour lunch"); Merkson Dep., Dkt. 110-2, at 82-83 (told by supervisors "that you're required to take your lunch period"); West Dep., Dkt. 110-2, at 23 ("told and instructed that you were to take your half-hour lunch period").

[6] *See*, *e.g.*, Hall Dep., Dkt. 110-2, at 146 ("Did anybody at Group O tell you not to take your lunch? A. No."); Gabriel Dep., Dkt. 110-2, at 31, 35 ("if you didn't take your lunch, it was your own decision. Correct? A. Yes. . . . So it's your decision of what you want to do with that time, right? A. Yes."); Merkson Dep., Dkt. 110-2, at 45 ("Did anybody tell you from Group O, do not take your lunch? A. No."); Murphy Dep., Dkt. 110-1, 120, 169 ("They didn't require me to work as far as through my lunch periods, but if I was considered to get my work done and to get it done in a timely manner, I had to work whatever I had to work to get it done. . . . But they didn't tell you you had to finish it before your shift ended, right? I mean, they let you work overtime when you needed to, right? A. Right.").

Citing the foregoing discovery taken since this Court's conditional certification of Plaintiffs' FLSA claim, Group O now moves to decertify the collective for that claim. *See* Dkt. 108. Plaintiffs oppose, noting that "[t]he parties in this current litigation are also involved in a state class action litigation in the Circuit Court of the Twelfth Judicial Circuit of Will County filed by the named Plaintiffs (Case No. 2012L000138) alleging violations of the Illinois Minimum Wage Law and the Illinois Wage Payment and Collection Act by Defendant," in which the presiding judge "ruled in favor of Plaintiffs' Motion for Class Certification and certified a class pursuant to Illinois state law." Pltf. Mem., Dkt. 123, at 4 (citing *Murphy v. Group O*, No. 2012L000138 (Cir. Ct. Will Cnty. filed Feb. 21, 2012)).

This Court expresses no view on the state court's class certification ruling or on Plaintiffs' state law claims in the Will County action (also brought as Counts II and III in this case). *See* Dkt. 1.[7] Having reviewed the parties' briefs on Group O's Motion to Decertify and the voluminous record they cite, however, this Court concludes that Plaintiffs' FLSA claim lacks a common policy or plan requiring Plaintiffs' and the 91 opt-in plaintiffs to work before or after their shifts or during meal periods without overtime pay, and that Plaintiffs and the opt-in plaintiffs lack sufficient similarity to allow this matter to proceed as a collective action under the FLSA. For the following reasons, therefore, the Court grants Group O's Motion to Decertify.

---

[7] Including the case now pending in Will County, the current action appears to be the third case in which Ms. Murphy has brought such claims against Group O. *See also Murphy v. Group O, Inc.*, No. 11-cv-2674 (N.D. Ill filed April 21, 2011; dismissed by stipulation Dec. 23, 2014) (asserting Illinois and FLSA claims).

## DISCUSSION

As discussed in the Court's May 2014 Order (Dkt. 48), the FLSA allows employees to sue their employer for unpaid wages, on behalf of themselves "and other employees similarly situated." 29 U.S.C. § 216(b). And as Plaintiffs acknowledge, courts have adopted a two-step process for determining whether such a lawsuit should proceed as a collective action, with the first step requiring "a minimal showing that others in the potential class are similarly situated." Pltf. Mem., Dkt. 123, at 2 (quoting *Jirak v. Abbott Labs., Inc.*, 566 F. Supp. 2d 845, 847 (N.D. Ill. 2008)). This first "conditional certification" stage thus requires such plaintiffs to make only a "modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Russell v. Ill. Bell Tel. Co.*, 575 F. Supp. 2d 930, 933 (N.D. Ill. 2008) (quoting *Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1045 (N.D. Ill. 2003)). If this low burden is met, notice may be issued to prospective plaintiffs who may opt into the action, with discovery to follow, as it did here. As Plaintiffs further acknowledge, however, the second step of the FLSA analysis requires "a more stringent standard." Pltf. Mem., Dkt. 123, at 3.

"Plaintiffs seeking to show that they are similarly situated at the second stage of a collective action under Section 216(b) of the FLSA, 'must demonstrate similarity beyond simply claiming that the FLSA has been violated; an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws must be present." *Id*. at 10 (quoting *Russell v. Ill. Bell. Tel. Co.*, 721 F. Supp. 2d

804, 812 (N.D. Ill. 2010)). Thus, at the second step of the FLSA analysis (the current posture of this case), "a court reevaluates the appropriateness of certification after members of the collective action have opted in and the parties have conducted discovery." *Elder v. Comcast Corp..*, No. 12 C 1157, 2015 WL 3475968, at *5 (N.D. Ill. June 1, 2015). "Once it is known which employees will be part of the class, the court must reevaluate the conditional certification to determine whether there is sufficient similarity between the named and opt-in plaintiffs to allow the matter to proceed to trial on a collective basis." *Id*. (quoting *Rottman v. Old Second Bancorp, Inc.*, 735 F. Supp. 2d 988, 990 (N.D. Ill. 2010)).

This determination requires consideration of several factors: "(1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns." *Id*. (quoting *Franks v. MKM Oil, Inc.*, No. 10 C 00013, 2012 WL 3903782, at *10 (N.D. Ill. Sept. 7, 2012)); *see also* Pltf. Mem., Dkt. 123, at 3. The Court considers these factors with respect to Plaintiffs' claims for (1) unpaid pre- and post-shift work, and (2) work during unpaid meal periods, in turn below.

I.  **Pre- and Post-Shift Work**

Plaintiffs' FLSA collective seeking overtime wages for pre- and post-shift work falters first for lack of a "common policy or plan that violated the law" and, correspondingly, for lack of "an identifiable factual nexus that binds the plaintiffs

together as victims of a particular violation of the overtime laws." *See* Pltf. Mem., Dkt. 123, at 3, 10 (quoting cases). As to the first, Plaintiffs argue that they have "sufficiently identified a common policy or practice" of Group O "rounding its employees' punch-in and punch-out times." *Id*. at 13. But as Group O correctly asserts, "the law does not proscribe the rounding of non-work time." Def. Mem., Dkt. 109, at 25. Rather, a rounding practice "will be accepted, provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked." 29 C.F.R. §785.48(b). An employer's "rounding" policy—even if applied to all employees—is thus insufficient by "itself" to retain certification of an FLSA collective.[8] "In other words, while the common rounding policy may have been sufficient at the conditional certification stage, it alone cannot bind the Plaintiffs' claims now." *See Kelly*, 2015 WL 3464131, at *5; *see also* Dkt. 48 (conditional certification Order discussing "rounding practice"). What matters at this stage of the FLSA analysis is the nature of the "factual inquiry" ultimately required for FLSA liability—whether Group O's rounding policy "was applied in such a manner that it actually resulted in unpaid work." *Kelly*, 2015 WL 3464131, at *5.

---

[8] *See*, *e.g.*, *Kelly v. Healthcare Servs. Group, Inc.*, No. 2:13-cv-00441-JRG, 2015 WL 3464131, at *4 (E.D. Tex. June 1, 2015) ("rounding policy cannot be enough . . . at the decertification stage, where the 'similarities necessary to maintain a collective action under § 216(b) must extend beyond the mere facts of job duties and pay provisions'" (quoting *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007)); *Adair v. Wisc. Bell, Inc.*, No. 08-C-280, 2008 WL 4224360, at *12 (E.D. Wisc. Sept. 11, 2008) (rounding practice applicable to all employees "does not automatically permit any of its employees to bring a collective action").

The pertinent question here, then, is whether this "factual inquiry" (whether Group O's rounding policy "was applied in such a manner that it actually resulted in unpaid work") is so "individualized" that "there is no efficiency gained by trying all the factual questions and defenses in one trial." *Id.*; *Adair*, 2008 WL 4224360, at *12 (plaintiffs and putative collective members must be "similarly situated as victims of a common illegal rounding policy"). Plaintiffs' collective seeking pre- and post-shift overtime wages fails on this score as well, for lack of "an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws." *See* Pltf. Mem., Dkt. 123, at 10 (quoting *Russell*, 721 F. Supp. 2d at 812). Plaintiffs attempt to supply such a nexus by asserting that Group O employees "were instructed to clock in 10 to 15 minutes prior to the start of their scheduled shifts," "were expected to be working" once "clocked in," and "were also directed to complete their assignments before punching-out for the day." Pltf Mem., Dkt. 123, at 5-6. From these assertions, Plaintiffs argue that "employees frequently began the undertaking of their assigned job duties prior to their scheduled start time, and continued working after their scheduled end time," but were not compensated for this time when their punch-in and punch-out times were rounded off. *Id.* at 6-8. But the record supports no such "factual nexus that binds the plaintiffs together."

As discussed above, the record demonstrates no Group O "early-in" policy, and instead shows that its employees could punch in "up until" their shift start-time, with some employees confirming that they were told ***not*** to punch in more than 8 or 10

minutes before their shift, and were reminded ***not*** to do so on those occasions that they punched in earlier. *See supra* note 1 and accompanying text. The record also dispels Plaintiffs' contention that Group O employees were expected to be working before their shift start-time, with several Plaintiffs testifying that their workday was expected to begin at their scheduled shift start-time.[9] Nor does the record demonstrate any common practice of Group O requiring employees to work past their shifts without compensation. In addition to various Plaintiffs who could not recall any uncompensated post-shift work (*see supra* note 3), several others admitted that they were compensated for their post-shift work, either because they sought and obtained permission to work overtime or were paid regardless. *See supra* note 2 and accompanying text. Indeed, Group O asserts (and Plaintiffs do not dispute) that its practices provide for employees who "work outside of their shift without approved overtime" to be nevertheless "paid but disciplined." Def. Mem., Dkt. 109, at 9-10 (citing Metzgar Dep., Dkt. 110-2, at 62-63); Def. Reply, Dkt. 126, at 4, 11 (citing Metzgar Dep., Dkt. 126-2, at 23-24, 28, 62-63).

The record thus "shows the opposite" of what is required to maintain collective certification; namely that Group O employees "were required to clock in early or

---

[9] *See, e.g.*, Creal Dep., Dkt. 110-1, at 80-82 ("They want you working at the time you're supposed to start at 7:00, right."); Merkson Dep., Dkt. 110-2, at 52-54 (workday began with daily meeting at shift start-time); Holmes Dep., Dkt. 110-2, at 48-50 (same); West Dep., Dkt. 110-2, at 71-72, 82 (conceding no compensation due for punching in a few minutes before shift start, in order to arrive at work station at or after shift start); Crisler Dep., Dkt. 110-2, at 43-44 (confirming that "you would be at your work station ready to go at the beginning of your shift," and no compensation due beforehand: "Well, I wasn't working -- if I wasn't at my workstation, correct.").

clock out late such that it resulted in a failure to compensate." *See Kelly*, 2015 WL 3464131, at *4 (policy providing that employees "may clock in 7 minutes before/after the beginning/end of your shift without discipline" demonstrated no "requirement to clock in before their shift began or clock out after their shift ended"). On the contrary, where Plaintiffs do claim to have worked before or after their shifts without compensation, Group O argues convincingly that they did so under "unique circumstances" depending upon their position, responsibilities, supervisor, and other factors. *See* Def. Mem., Dkt. 109, at 1-2, 12-13, 18, 27-28. Each such claim would require a separate determination of whether the employee was performing tasks that are compensable—as opposed to ordering food, eating, having coffee, socializing, reading, or smoking (*see id*. at 6-7, 24)—as well as any affirmative defenses raised by Group O—such as whether any time spent working was excludable under the Portal to Portal Act[10] or as de minimis.[11] *See also* Def. Mem., Dkt. 109, at 23-25, 33.

---

[10] *See Marshall v. Amsted Rail Co.*, No. 10-cv-0011-MJR-SCW, 2012 WL 5499431, at *8 and n.2 (S.D. Ill. Nov. 13, 2012) ("compensation is required under the FLSA only for preliminary and postliminary work that is *integral and indispensable* to an employee's primary job duty . . . . The Portal-to-Portal Act excused employers from compensating employees for time spent traveling to and from the place they perform their principal activities *and* eliminated employer liability for time engaged in 'preliminary' or 'postliminary' activities (which occur before or after the employee engages in his 'principal' activity)." (citing 29 U.S.C. 254(a))).

[11] *See Marshall*, 2012 WL 5499431, at *8 ("activities that require only a de minimis amount of time are not compensable under the FLSA") (citing *Sandifer v. U.S. Steel Corp.*, 678 F.3d 590, 593 (7th Cir. 2012) ("It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved."); *Kellar v. Summit Seating, Inc.*, 664 F.3d 169, 176 (7th Cir. 2011) ("The de minimis doctrine allows employers to disregard otherwise compensable work when only a few seconds or minutes of work beyond the scheduled

As in *Elder* and *Marshall*, the need for such individualized inquiries precludes "a common answer to the question of whether Plaintiffs actually worked pre-shift and post-shift work," and thus renders it "impossible to generate common answers on a classwide basis."[12] Plaintiffs nevertheless attempt to avoid this conclusion by arguing that *Elder* did not involve "a common practice of rounding," such as Plaintiffs have identified here. Pltf. Mem., Dkt. 123, at 13. But as explained above, rounding alone is insufficient to retain collective certification where the collective's overtime claims otherwise lack a factual nexus. *See Kelly*, 2015 WL 3464131, at *4. Indeed, Plaintiffs' chief authority—*Russell v. Illinois Bell*—makes that very point. Although *Russell* retained certification of a collective of "sales and service employees" where "time–rounding and logout time policies caused some plaintiffs to perform unpaid post-shift work," the court was careful to note that the plaintiffs in that case had "similar job duties" and were subject to the same "adherence and average handle time policies" at the heart of their overtime claims. *Russell*, 721 F. Supp. 2d 811-16 and n.2. The situation here is starkly different.

---

working hours are in dispute.")); *see also* 29 C.F.R. 785.47 ("insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded. The courts have held that such trifles are de minimis.").

[12] *See Elder*, 2015 WL 3475968, at *7-9 (decertifying collective where "the answer for one technician does not necessarily shed light on the answer for another"); *Marshall*, 2012 WL 5499431, at *8-9 (decertifying collective where differences in "job titles, job duties, compensation plans, and other employment circumstances produce highly particularized claims requiring fact-specific inquiries which render it inappropriate to try them collectively").

Unlike the sales and service employees in *Russell*, Plaintiffs and the 91 opt-in plaintiffs here "worked in twenty-seven different positions"—including "clerks, various types of forklift operators, spotters, kitters, pickers, supervisors, leads and storeroom managers"—and thus had "different work duties, work locations, shifts and supervisors." *See* Def. Mem., Dkt. 109, at 11-12. Some "could leave at the end of their shift and employees on the next shift would continue their work," while others had no ready replacement. *Id*. at 12. Some were "tied to particular location[s]," while others "could go almost anywhere in the building and work any position." *Id*. Some had significant "travel times from the timeclocks to their workstations because of the vast size of the CAT facility," while some were just a minute or two away. *Id*. at 13. These differences bear heavily on Plaintiffs' claims that they were required to punch-in early or work late. And even Plaintiffs' brief demonstrates the impact of different supervisors on their claims, complaining about only a few of the 29 to whom Plaintiffs and the opt-in plaintiffs reported, and one (Tracy Smith) numerous times. *See* Pltf. Mem., Dkt. 123, at 15-16, 18, 20-22, 25; *see also Russell*, 721 F. Supp. 2d at 815 (acknowledging decertification in cases where "one or relatively few managers gave the unlawful instruction").[13]

---

[13] Contrary to Plaintiffs' argument, the Seventh Circuit's decision in *Chicago Teachers Union, Local No. 1 v. Bd. of Educ.*, 797 F.3d 426 (7th Cir. 2015), supports no different result. While *Chicago Teachers* concluded that some supervisor discretion will not necessarily defeat commonality for class certification purposes where "a uniform employment practice" is "used by the same decision-making body," it went on to stress that "[d]ecisions by myriad low-level managers are different than decisions made by a single lead decision-maker or a few concentrated top-level

The *Russell* court was careful to distinguish just such cases, where a "variety of job duties" and "disparate individualized claims" are "difficult for the court to manage collectively." *Russell*, 721 F. Supp. 2d at 811 n.2, 815. Accordingly, not only is *Russell* distinguishable on its facts, its rationale and reasoning—like *Elder* and *Marshall*—similarly counsel in favor of decertification here.

## II. Unpaid Meal Breaks

Plaintiffs' collective seeking overtime wages for work during unpaid meal periods fails for similar reasons. Once again, this collective falters at the outset for lack of a Group O "common policy or plan that violated the law," since it is undisputed that Group O's employee manual instructed employees to take their "full-allotted time for your meal period" and "not perform any work during your meal period." *See supra* note 4; *see also* Pltf. Mem., Dkt. 123, at 15-16 (acknowledging policy). Indeed, as noted above, several Plaintiffs have admitted that they knew of this policy, either because they read it in the employee manual or were told by their supervisor. *See supra* note 5. Like Group O's rounding policy, this meal deduction policy similarly provides no support for Plaintiffs' claims because, "in and of itself," it "does not violate the FLSA." *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 350 (N.D. Ill. 2012). "As such, that policy cannot, without more, bind Plaintiffs together for purposes of the 'similarly situated' inquiry." *Id*.

---

managers." *Id*. at 440. Plaintiffs here have identified no such "uniform employment practice" (other than Group O's permissible rounding policy), and instead complain of decisions by "myriad low-level managers."

Plaintiffs attempt to remedy this problem by arguing that the "mere existence of a written policy" should not "shield" an employer from liability "when such a policy was not consistently enforced." Pltf. Mem., Dkt. 123, at 16. But inconsistent enforcement falls far short of the "identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws" that even Plaintiffs acknowledge is needed to retain collective certification. *See id.* at 10 (quoting *Russell*, 721 F. Supp. 2d at 812). Nor does the record evidence any such common violation of Group O's meal policy that could bind Plaintiffs and the opt-in plaintiffs together here. For instance, several opt-in plaintiffs who claim to have worked during their meal periods have admitted that they did so of their own accord (indicating that they were not required to do so by Group O or its management), *see supra* note 6; and that they knew of no other employees who did so (indicating that the practice was not common).[14] Plaintiffs have thus failed to demonstrate that any non-enforcement of Group O's meal policy was "uniform" or "system-wide." *See Camilotes*, 286 F.R.D. at 351; *see also Creely v. HCR ManorCare, Inc.*, 920 F. Supp. 2d 846, 852 (N.D. Ohio 2013) ("the relevant inquiry at this final certification stage is whether Defendant inadequately and unlawfully implemented its auto-deduct [meal] policy 'across the board' creating a class of similarly situated Plaintiffs").

---

[14] *See*, *e.g.*, Hernandez Patrick Dep., Dkt. 110-2, at 24-25 (confirming that employees "always took their half hour lunch . . . unless, you know, people left early"); Hall Dep., Dkt. 110-2, at 154 (no knowledge "that any other employees at Group O either worked through their lunch or didn't take their full lunch"); West Dep., Dkt. 110-2, at 75 (same); Merkson Dep., Dkt. 126-2, at 45-46 (same).

Equally problematic for Plaintiffs' unpaid meal collective (and much like their collective seeking overtime wages for pre- and post-shift work), the record also shows that their overtime claims for work during unpaid meal breaks (and Group O's defenses thereto) are highly individualized. As an initial matter, all of the same differences in employee positions, job duties, and supervisors discussed above (*see supra* Part I) bear equally on Plaintiffs' meal break claims, since such differences likewise lead to "variation in the frequency, nature and duration of the lunch break interruptions." *See Elder*, 2015 WL 3475968, at *10. For example, some meal periods were interrupted for meetings, some to "spot trucks," some to handle "hot parts" or other "urgent" issues, and some to keep up with an individual workload, *see* Def. Mem., Dkt. 109, at 17, 30, or to avoid leaving late, even though "they let you work overtime when you needed to." *See* Murphy Dep., Dkt. 110-1, 120, 169. Relatedly, some opt-in plaintiffs admitted that they took all or part of their meal break after the interruption (or could have done so),[15] raising individualized questions regarding the necessity, frequency, and extent of work performed during unpaid meal breaks on an employee-by-employee (and lunch-by-lunch) basis. And there is also evidence of mealtime spent in the smoking area, eating lunch, and getting to and from a smoking or eating area, *see* Def. Mem., Dkt., 109, at 17, again raising individualized questions as to how much work was performed during unpaid meal breaks.

---

[15] *See, e.g.*, Hernandez Patrick Dep., Dkt. 110-2, at 24; Gabriel Dep., Dkt. 110-2, at 31; Hall Dep., Dkt. 110-2, at 146-47. *See also* Lujan, Dkt. 110-2, at 42-43 ("And you knew that after you completed whatever the requested task was, that you could take your full lunch, correct? A If you had the time to, yes.")

Also of note, while Ms. Creal and one opt-in plaintiff say they complained to their supervisors about working through meal periods, *see* Pltf. Mem., Dkt. 123, at 25, other opt-in plaintiffs admitted that Group O was not so informed about their mealtime work.[16] This difference is meaningful too, since Group O asserts a lack of "actual or constructive knowledge" that employees were working through their meal periods in violation of Group O policy,[17] which also must be determined case-by-case. As Group O argues, several district courts have concluded that meal period overtime claims "are not suitable for a collective action" in such a case—*i.e.*, where (as here) the employer's policy "prohibits work during the meal period." *See* Def. Mem., Dkt. 109, at 29 (citing *Camilotes*, 286 F.R.D. at 351 ("A number of courts have decertified FLSA collective actions in cases involving automatic meal deduction polices that are similar to the one at issue in this case.") (collecting cases)). And that conclusion is even stronger where (also as here) there are "significant factual differences among the departments with respect to when [employees] are able to take their meal breaks and under what circumstances." *Camilotes*, 286 F.R.D. at 351; *Elder*, 2015 WL 3475968, at *9 (disparate claims provided for no "common answer concerning the frequency or duration of meal break work"). This case, therefore, requires the same result.

---

[16] *See*, *e.g.*, Hall Dep., Dkt. 110-2, at 152-53 (never informed management or supervisors that he was working through lunch); West Dep., Dkt. 110-2, at 75 (no "information or knowledge that Group O was aware that employees were working through some or all of their otherwise unpaid lunch break").

[17] *See* Def. Mem., Dkt. 109, at 34 (citing *Kellar v. Summit Seating, Inc.*, 664 F.3d 169, 177 (7th Cir. 2011)); Def. Reply, Dkt. 126, at 11 (quoting *Kellar*: the FLSA "stops short of requiring the employer to pay for work it did not know about, and had no reason to know about").

## CONCLUSION

For the foregoing reasons, the Court grants Defendant Group O's Motion to Decertify FLSA Collective Action (Dkt. 108), and the FLSA claims of the 91 plaintiffs who have opted into this action (*see* Dkt. 110-4 at Def. Ex. 30) are dismissed without prejudice. Plaintiffs' pending Motion for Partial Summary Judgment (Dkt. 112) is also denied without prejudice to refiling later in this action by, and on behalf of, the individual named Plaintiffs in this action.

Dated: January 8, 2016

Charles P. Kocoras
United States District Judge